Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KIRK EADY,

        Plaintiff,

    v.

TAPFURY LLC, *et al.*

        Defendants.

Civil Action No.: 17-13483 (ES) (JSA)

OPINION

SALAS, DISTRICT JUDGE

Before the Court are cross-motions for summary judgment filed by Plaintiff Kirk Eady and Defendants TapFury, LLC, TapFury, Inc., PrankDial, LLC,[1] Kickback, Inc., and Fahim Saleh. (D.E. Nos. 58 & 59). Having considered the parties' submissions, the Court decides this matter without oral argument. Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court DENIES Plaintiff's motion, GRANTS Defendants' motion, and enters judgment in Defendants' favor.

## I.    BACKGROUND

Unless otherwise noted, the following facts are not in dispute.[2] TapFury operated a website called PrankDial.com. (Defs. SUMF ¶¶ 3 & 87; Eady Mov. Br. ¶ 2). The website offered two applications designed for customers to make prank phone calls: PrankDial and Evil Operator. PrankDial allowed a customer to send a spoofed phone call with a pre-recorded message to another

---

[1]    In their briefing, the parties do not distinguish between these seemingly related entities. Accordingly, the Court will hereinafter refer to them together as TapFury.

[2]    The Court primarily pulls the facts from Defendants' statement of undisputed material facts (D.E. No. 58-1 ("Defs. SUMF")) and the section of Eady's moving brief titled "Statement of Facts" (D.E. No. 59 ("Eady Mov. Br.")). The Court notes that Eady's "Statement of Facts" does not comply with Local Rule 56.1(a), which requires the "statement of material facts [to] be a separate document (not part of a brief)."

person.  (Eady Mov. Br. ¶ 4).  Evil Operator allowed customers to initiate calls between two people who would believe the other person had initiated the call.  (Defs. SUMF ¶¶ 3–4 & 86–93; Eady Mov. Br. ¶ 5).  The customer could then listen to the resulting conversation and record it—without either person's knowledge.  (Defs. SUMF ¶¶ 3–4, 91 & 93; Eady Mov. Br. ¶ 5).  To use either application, the customer was required to purchase tokens.  (Defs. SUMF ¶ 88; Eady Mov. Br. ¶ 5).

This case stems from Eady's use of Evil Operator, for which he was indicted by a federal grand jury on May 19, 2014, for one count of illegal wiretapping in violation of 18 U.S.C. § 2511(1)(a).  *See* Indictment, *United States v. Eady*, Crim. No. 14-0277, D.E. No. 8.  Section 2511(1)(a) makes it a crime to intentionally intercept or endeavor to intercept any wire, oral, or electronic communication unless, pursuant to subsection (2)(c), the interceptor is a party to the communication or a party to the communication consents to interception.

At trial, the Government presented evidence showing that, in spring 2012, Eady used Evil Operator to surreptitiously listen to and record the phone conversations of other people without their knowledge or consent.  (Defs. SUMF ¶ 5; Eady Mov. Br. ¶¶ 13–15).  Eady, the former Deputy Director of the Hudson County Correctional Center ("HCCC"), targeted senior members of the Corrections Officers Union and the operator of EDPDLaw.com.  (Defs. SUMF ¶ 1; Eady Mov. Br. ¶ 17).  Both the union members and EDPDLaw participated in processing grievances against HCCC's management, and EDPDLaw published articles critical of management, including Eady. (Defs. SUMF ¶¶ 21, 34–37 & 42–43).  The Government presented evidence at trial suggesting that Eady's motive was to harass and retaliate against the targets.  (*Id.* ¶ 6).[3]

---

[3]     Eady disputes that his motive was to harass and retaliate, but he concedes that there was testimony at his trial "as to [his] possible motivation for his use of Evil Operator."  (D.E. No. 60 ("Eady Opp. Br.") at 6).  Moreover, in a post-trial motion for bail pending appeal, he conceded that his motive was "[t]o counteract and neutralize the untrue and disruptive articles being published in EDPDLaw."  (D.E. No. 64-4, Ex. G, at 2).  He also admitted in his deposition

At trial, Eady sought to shift blame to TapFury, claiming that TapFury recorded the calls and caused Eady to believe his conduct was legal.  (*Id.* ¶¶ 81–84 & 101–129).  However, the trial court rejected Eady's attempts to do so during cross-examination and closing argument, explaining that TapFury's involvement was irrelevant and that ignorance of the law is not an excuse to criminal punishment.  (*Id.* ¶¶ 102, 119–121, 126 & 129).

On March 13, 2015, the jury found Eady guilty by general verdict of one count of violating § 2511(1)(a).  *See* Jury Verdict, *Eady*, No. 14-cr-0277, D.E. No. 44.  On September 10, 2015, the Honorable Jose L. Linares, U.S.D.J., sentenced Eady to a term of imprisonment of 21 months.  *See* Judgment, *Eady*, Crim. No. 14-0277, D.E. No. 57.  Eady appealed, and the Third Circuit affirmed his conviction and sentence.  *See United States v. Eady*, 648 F. App'x 188 (3d Cir. 2016).  Pertinent here, the Third Circuit held that Eady was not a "party" to the call because his presence was not known to the other participants.  *Id.* at 192.  Therefore, he could not consent to interception pursuant to § 2511(2)(c).

Eady now sues Defendants, claiming that they failed to disclose material facts concerning the legality of Evil Operator, thereby causing him to use the application in violation of federal law. (D.E. No. 12 ("SAC")).  He brings ten counts in the SAC—the central one being that Defendants violated the New Jersey Consumer Fraud Act (the "CFA" or "Act"), N.J.S.A. § 56:8-1 *et seq.*  (*Id.* ¶¶ 63–78).  His other counts include a negligent misrepresentation claim, various contract and quasi-contract claims, and various requests for relief.  (*Id.* ¶¶ 52–62 & 79–108).  Both Eady and Defendants move for summary judgment.  (D.E. Nos. 58 & 59).

## II.   LEGAL STANDARD

A court may enter summary judgment when there are no genuine issues of material fact

---

that he used Evil Operator to play a "prank" on people who wrote things online about his personal life.  (D.E. No. 58-3, April 9, 2021 Deposition of Kirk Eady, at 44:9–22).

and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if it is supported by evidence such that a reasonable jury could find the fact in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*  A court "should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor," *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013), and the procedure for summary judgment "is no different where there are cross-motions for summary judgment," *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

## III.    DISCUSSION

### A.    Consumer Fraud Act

Enacted in 1960, the CFA is remedial legislation aimed at correcting and deterring harm caused by "unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate."  *Real v. Radir Wheels, Inc.*, 969 A.2d 1069, 1075 (N.J. 2009) (quoting *Daaleman v. Elizabethtown Gas Co.*, 390 A.2d 566, 569 (N.J. 1978)).  To that end, the Act prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate."  N.J.S.A § 56:8-2.  The Act defines "merchandise" to "include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  § 56:8-1(b).  And the Act gives a consumer a private right of action and entitles the consumer to treble damages in a successful suit.  § 56:8-19.

"An 'unlawful practice' contravening the CFA may arise from (1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation." *Dugan v. TGI Fridays, Inc.*, 171 A.3d 620, 636 (N.J. 2017).  A claim for an affirmative act or a violation of an administrative regulation does not require a showing of knowledge and intent to deceive by the defendant.  *Id.*; *see also Monogram Credit Card Bank of Georgia v. Tennesen*, 914 A.2d 847, 853 (N.J. Super. App. Div. 2007) ("An affirmative misrepresentation, even if unaccompanied by knowledge of its falsity or an intention to deceive, is sufficient.").  Meanwhile, a claim of knowing concealment requires the plaintiff to show that the defendant (i) had a duty to disclose (ii) but knowingly concealed (iii) a material fact (iv) with the intent that the plaintiff relies on the concealment.  *Judge v. Blackfin Yacht Corp.*, 815 A.2d 537, 541–42 (N.J. Super. App. Div. 2003).  For all claims under the Act, the plaintiff must show "a causal relationship between the unlawful fraud and his loss." *Id.* (citing § 56:8-19).

It is unclear whether Eady has brought a claim under the CFA for an affirmative act—that is, a false or misleading representation.  In his moving brief, Eady does not identify a single false or misleading statement that Defendants made concerning PrankDial or Evil Operator.  Instead, he focuses on Defendants' failure to disclose that his use of Evil Operator would violate 18 U.S.C. § 2511(1)(a).  In his opposition brief, he identifies some statements of Defendants but couches them in a failure-to-disclose argument.  (Eady Opp. Br. at 5–7).  The Court will therefore first discuss Eady's knowing concealment claim, and then discuss the requirements for an affirmative act claim.

### (i)    Knowing Concealment

Eady argues that Defendants violated the CFA by failing to disclose that use of "Evil Operator" may violate "federal wiretapping statutes."  (Eady Mov. Br. at 11).  And he argues that Defendants were "aware of the possibility."  (*Id.*).  Defendants argue that Eady "was warned that

unlawful use of Defendants' product was a violation of its Terms of Service (and/or inherently unreasonable, and thus unforeseeable)." (D.E. No. 58 ("Defs. Mov. Br.") at 16). Defendants further argue that, in any event, they were under no duty to disclose because "[t]he risk of criminal prosecution when committing crimes is an open and obvious danger." (D.E. No. 64 ("Defs. Reply") at 6). The Court agrees with Defendants: they were not under a duty to disclose.

As a starting point, the Court notes that "[t]he parties have not directed the Court to any New Jersey case—and the Court's own research did not uncover any—that squarely addresses . . . whether, under the NJCFA, advertisers are ever obliged to educate the public on the law applicable to their product absent other specific authority requiring such disclosures." *Cole v. Camelback Mountain Ski Resort*, No. 16-1959, 2017 WL 2805499, at *3 (M.D. Pa. June 28, 2017). At least one court has predicted the New Jersey Supreme Court would impose no such obligation because a legal omission, as opposed to a factual omission, is not the type of omission contemplated under the CFA; imposing a duty to disclose law would violate the well-known legal maxim that "[a]ll citizens are presumptively charged with knowledge of the law"; and imposing such a duty would subject businesses to "unending liability." *Id.* at *4–5. The Court agrees that those reasons suffice to predict that the New Jersey Supreme Court would not impose a general duty on businesses to educate the public on the law applicable to their products. However, the Court will also explain why, after applying the factual circumstances of this case to New Jersey's well-settled standards for when a duty to disclose arises, Defendants were under no such duty.

Whether there is a duty to disclose ordinarily presents "a question of law" for a court to determine "in light of the factual circumstances." *Judge*, 815 A.2d at 542. "The question is one of fairness and policy that 'involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise

care, and the public interest in the proposed solution.'"  *United Jersey Bank v. Kensey*, 704 A.2d 38, 43–44 (N.J. Super. App. Div. 1997) (quoting *Hopkins v. Fox & Lazo Realtors*, 625 A.2d 1110, 1116 (N.J. 1993)).  In New Jersey, "[t]here are three general classes of transactions in which a duty to disclose arises" as a result of a special relationship between the parties:

> The first involves fiduciary relationships such as principal and agent or attorney and client.  The second embraces situations in which either one or each of the parties, in entering the transaction, expressly reposes a trust and confidence in the other or because of the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence is necessarily implied. The third includes contracts or transactions which in their essential nature, are intrinsically fiduciary, and necessarily call for perfect good faith and full disclosure, without regard to any particular intention of the parties.

*Id.* at 44 (cleaned up).

Here, there is no suggestion of an express or implied fiduciary relationship, so the first and third classes of special relationships do not apply.  "Where, as here, there is no presumed fiduciary relationship, the law imposes a duty to disclose only if a party, 'in entering the transaction, expressly reposes a trust and confidence in the other or, because of the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence is necessarily implied.'"  *Bayda v. Howmet Castings & Servs., Inc.*, 859 F. App'x 623, 625 (3d Cir. 2021) (quoting *Kensey*, 704 A.2d at 43–44).  In addition, there is no suggestion that Eady expressly reposed a trust or confidence in Defendants.  Accordingly, Defendants had a duty to disclose only if a trust or confidence is implied by the circumstances of this case, the nature of the parties' dealings, or the parties' position towards each other.

The Restatement (Second) of Torts is instructive.  *See Kensey*, 704 A.2d at 45 (explaining that New Jersey "has adopted that interpretation of the Restatement" (citing *Strawn*, 657 A.2d at 429)); *see also Lithuanian Com. Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 478 (D.N.J. 1998).

The Restatement explains that a person has a duty to disclose "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."  Restatement (Second) of Torts § 551(2)(e) (Oct. 2021 update) (hereinafter "Restatement").  The Restatement acknowledges the difficulty in determining when those circumstances are present.  *Id.* § 551 cmt. l.  But courts have found duties to exist where "the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware."  *Id.*  In determining whether that scenario is present, New Jersey courts have identified "[t]he principal factors" as "'the difference in bargaining power' between the parties 'and the difference in access to information.'"  *Kensey*, 704 A.2d at 48 (quoting *Strawn*, 657 A.2d at 428).  New Jersey courts have also looked to whether the seller uses its professional position to knowingly pressure, coax, or encourage the buyer to engage in an unsound or fraudulent transaction.  *See id.* at 46.

Here, the failure to disclose is not so shocking to the ethical sense of the community or so extreme and unfair as to amount to a form of swindling.  The principal factors New Jersey courts have looked to are absent from this record.  So too is evidence that Defendants knowingly pressured, coaxed, or encouraged Eady to commit an unsound or fraudulent purchase.

*First*, there is no evidence to suggest an asymmetry in access to information.  What Eady believes should have been disclosed is public information—namely, that surreptitiously listening to and recording other people's conversations without their consent or knowledge is unlawful.  It is not information exclusively or especially in the possession of anyone, let alone Defendants.  Nor

is it information that is difficult to discover.  As Defendants point out, people "are legally on notice of criminal laws as soon as they are enacted."  (Defs. Reply at 6).[4]  And regardless, a reasonable consumer should know to refrain from what Eady did—not simply because his conduct was unlawful but because he violated the privacy interests of others.

*Second*, there is no evidence to suggest that Defendants used their superior bargaining power to take advantage of Eady or to compel or induce him to engage in an unsound transaction, let alone compel or induce him to violate federal law.  Eady exercised his own agency.  *Cf. Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 751 (N.J. 2009) ("Moreover, we see no unfairness in refusing to find a CFA remedy for a plaintiff whose entire claim was premised on his own decision to engage in a fraudulent transaction.").  And there were various legal and harmless uses of Evil Operator that people, including Eady, could perform.  For example, two friends, one of whom is a known and present party to the call, could prank another; or one could refrain from listening to the resulting conversation altogether.  Nothing pressured, coaxed, or encouraged Eady to violate federal law.

*Third*, there is no evidence to suggest that Defendants subjectively knew that Eady's conduct would violate federal law.  Notwithstanding, Eady cites two pieces of evidence to establish Defendants' knowledge.  (Eady Mov. Br. at 6; Eady Opp. Br. at 8).  But after close review of the evidence, no reasonable juror could find that Defendants knew that Eady's conduct would violate federal law.

Eady first cites an undated letter authored by counsel for TapFury.  (Eady Mov. Br. at 6). In the letter, counsel points out a "specific problem" concerning Evil Operator: "if neither party to

---

[4]     *Cf. Buddy v. Knapp*, 262 A.3d 1227, 1242 (N.J. Super. App. Div. 2021) (declining, in a premises liability case, "to impose on commercial property owners the obligation to warn business patrons of the obvious danger posed by [unlawfully] driving over two sets of solid yellow lines to cross two lanes of opposing traffic on a highway with a fifty-five-mile-per-hour speed limit").

these calls are aware of TapFury's presence on the line recording them, any federal or state court could potentially find a lack of even one party's consent, and thus liability under any applicable wiretapping statute.  If TapFury's presence as part of the call were somehow announced, then TapFury or the user might be able to provide the necessary consent for a one-party jurisdiction, but that may blunt the effect of the prank."  (D.E. No. 59-2, Ex. 6, at 5).  But counsel also "assume[d]" that federal and state law would (i) recognize "the user"—that is, the Evil Operator customer—as "a party to [the] telephone call" and (ii) find that the customer gave his or her "consent to record that call."  (*Id.* at 1).  Under that assumption, counsel concluded that the "practice of obtaining consent from the user of the Services to record calls should be sufficient to meet the bar set by the federal wiretapping law."  (*Id.*).  Counsel's assumption was wrong—as set forth in the Third Circuit's holding that Eady was not a party to the calls, because his presence was not known by the other participants, and thus he could not give consent.  *See Eady*, 648 F. App'x at 192.  But the record does not support Eady's conclusion that Defendants knew their position was wrong.

Eady next cites an Internet article dated June 13, 2012, authored by Ruby Saleh, the former Director of Business Development at TapFury, providing commentary about why Google removed PrankDial from the Android Market.  (Eady Opp. Br. at 8).  In the article, she explains that Google did so, in part, out of concerns for "the ramifications of recording phone conversations without consent."  (D.E. No. 59-1, Ex. 2, at 7).  But Ruby Saleh responded to Google's view by explaining that PrankDial complied with state laws that required one party's consent to record because "[w]e consider the person initiating the call to be the consenting party."  (*Id.* at 8).  She also noted that customers were not allowed to use PrankDial to call people in states that required the consent of

all parties.  (*Id.*).  While her subjective belief concerning the customer's presence as a consenting party was wrong, Eady has not pointed to any evidence refuting that she actually believed it.

*Fourth*, while Defendants were aware of the *possibility* that their products could be used unlawfully, there is no evidence suggesting that Defendants deliberately ignored or withheld this potential issue from customers in order to swindle them.  For example, Ruby Saleh's Internet article candidly presented both sides of the issue.  (D.E. No. 59-1, Ex. 2, at 7–8).  Moreover, TapFury's Terms of Service contained various disclaimers and warnings suggesting that certain uses of Evil Operator were wrongful and unlawful.  (D.E. No. 59-2, Ex. 5, Gov't Ex. 148A).  While the Terms of Service did not point out the wiretapping issues, the Terms of Service prohibited customers from using the applications to harass and cautioned customers to use the applications in compliance with local law.  (*Id.*).

Eady disputes that he agreed to the Terms of Service, arguing that Defendants failed "to provide reasonable conspicuous notice of the existence of the contract terms."  (Eady Opp. Br. at 5).  The crux of his argument is that the webpage on PrankDial.com (where a customer would initiate a call) did not include a "hyperlink to the terms of service" next to the statement, "By sending this call, you agree to our terms of service."  (*Id.* at 4).  However, Defendants point out that "the [phrase] 'terms of service' [itself] functioned as a hyperlink."  (Defs. Reply at 3).  In support, Defendants cite the testimony of Todd Saul, a former TapFury engineer, and the PrankDial webpage itself, which displays the phrase "in a distinctive blue color, clearly indicating it [wa]s a hyperlink."  (*Id.* at 3–4 (citing D.E. No. 58-1, Ex. D, Gov't Ex. 147)).  Eady submits no evidence disputing that the hyperlink to the Terms of Service was conspicuously positioned on the webpage.

In addition, before Eady used Evil Operator, Defendants disabled the record feature unless a customer certified, "I agree to notify the caller they are being recorded."  (D.E. No. 59-1, April 7, 2021 Deposition of Ruby Saleh, at 49:17–18 & Ex. SALEH-A).  Citing his own deposition testimony, Eady disputes there was a certification feature when he used Evil Operator, and he argues in any event that it did not sufficiently warn a reasonable consumer.  (Eady Opp. Br. at 9– 10).  But taking his deposition testimony as far it goes, he raises the possibility, which Defendants concede, that he used an older version of Evil Operator.  (D.E. No. 55).  Indeed, he has not submitted any evidence disputing that Defendants implemented the certification in some form before he used Evil Operator.  Thus, the central conclusion remains:  There is no evidence upon which a reasonable juror could rely to find that Defendants deliberately ignored or withheld the potential for unlawful use from its customers.

Taken together, the record does not reasonably present a situation where Defendants' failure to disclose that users of Evil Operator may violate federal wiretapping laws is so shocking to the ethical sense of the community or so extreme and unfair as to amount to a form of swindling. The principal factors that give rise to a duty to disclose are absent from this record, as is evidence that Defendants pressured or coaxed Eady to commit an unsound or fraudulent purchase. Accordingly, there is no special relationship that would impose a duty to disclose.

### (ii)    Affirmative Act

As noted, it is unclear whether Eady has brought a claim under the CFA for an affirmative act—that is, a false or misleading representation.  Eady's moving brief focuses on Defendants' failure to disclose that his use of Evil Operator would violate 18 U.S.C. § 2511(1)(a), and his opposition brief argues Defendants made misleading statements but couches his legal theory in a failure-to-disclose argument.  (Eady Opp. Br. at 5–7).  While a party is under a duty to disclose

information if "disclosure is necessary to make a previous statement true" or to make a previously true statement not misleading, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) (citing *Berman v. Gurwicz*, 458 A.2d 1311, 1313 (N.J. Super. Ch. Div. 1981)), a claim for an affirmative act, which may involve a seller making a true but misleading statement, is an easier claim to prove under the CFA.   Indeed, while a claim of knowing concealment requires a showing of knowledge and intent to deceive, *Judge*, 815 A.2d at 541–42, neither element is necessary for a claim for an affirmative act, *see Dugan*, 171 A.3d at 636; *Monogram*, 914 A.2d at 853.[5]   However, even if the Court construes Eady to bring a claim for an affirmative act, which it appears he did not, Eady cannot survive summary judgment.   Out of an abundance of caution, the Court will analyze the standards for an affirmative act.

"[A] literally true statement can still have the capacity to mislead the average consumer." *Suarez v. E. Int'l Coll.*, 50 A.3d 75, 88 (N.J. Super. App. Div. 2012); *see also* Restatement § 529 ("A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation.").   Accordingly, a true statement or advertisement is actionable if it has "the capacity to mislead the average consumer"—in other words, "if the overall impression it creates is misleading and deceptive to an ordinary reader." *Union Ink Co. v. AT&T Corp.*, 801 A.2d 361, 379 (N.J. Super. App. Div. 2002) (cleaned up).   However, mere puffery is not actionable. *See Rodio v. Smith*, 587 A.2d 621, 624 (N.J. 1991).   "Advertising that amounts to 'mere' puffery is not actionable because no reasonable consumer relies on puffery.   The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions."

---

[5]      Accordingly, if Eady brought his claim as only one for knowing concealment, his claim would fail for failure to submit proof of knowledge. *See Judge*, 815 A.2d at 541–42; Restatement § 551(2)(b) (explaining there is a duty to disclose "matters *known* to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading" (emphasis added)).

*Lieberson v. Johnson & Johnson Consumer Companies, Inc.*, 865 F. Supp. 2d 529, 540 (D.N.J. 2011) (quoting *In re Toshiba Am. HD DVD Mktg. & Sales Pracs. Litig.*, No. 08-0939, 2009 WL 2940081 (D.N.J. Sept. 11, 2009)).

Eady argues that Defendants made false or misleading representations by "touting the PrankDial website as being a top-preforming application with 1 million users and that it was ranked in the top 100 of applications and one of the top 25 applications in the entertainment category"; "assert[ing] its website offerings are fun and harmless"; and "proclaim[ing] use of the application comports with New Jersey and federal laws." (Eady Opp. Br. at 6). The Court will consider each set of statements identified by Eady.

*Popularity of PrankDial.com.* Defendants' statements concerning the popularity of PrankDial.com are not misleading. While they are not puffery—because they are specific and measurable statements of fact—they do not have the capacity to mislead a reasonable consumer into believing that Eady's use of Evil Operator was lawful.

*Fun and Harmless Nature of PrankDial.* Defendants argue that their statements "regarding the harmless and fun nature of its product, considered in the light most favorable to [Eady], rise only to the nature of puffery." (Defs. Opp. Br. at 18). The Court agrees. Defendants' statements are vague and subjective, and they are not of a kind that a reasonable consumer would rely on. *See, e.g.*, *Rodio*, 587 A.2d at 624 ("You're in good hands with Allstate"); *New Jersey Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 177 (N.J. Super. App. Div. 2003) ("you . . . can lead a normal nearly symptom-free life again"). Either way, they do not reasonably lead a consumer to believe that Eady's use of Evil Operator was lawful. Indeed, a reasonable consumer would not understand the statement "this product is fun and harmless" to mean the consumer can use the product in any manner and under and set of circumstances.

14

_Legality of PrankDial_.  The record indicates that Defendants' made two statements to their customers concerning the legality of PrankDial and Evil Operator.

The first statement appears on the PrankDial webpage where a customer initiated a call. The statement consists of the following certification that was positioned above a button titled "Send Prank": "I agree to record this call with the knowledge that the person I am calling is not currently located in any of the following states:  CA, PA, FL, IL, MI, WA, MD, MA, CT, NV, NH or MT."  (D.E. No. 60-3, Ex. 2, Gov't Ex. 147).  The implication from this statement is that a customer may record a call in the states not listed—and may do so lawfully.

However, this statement is not misleading for several reasons.  First, it does not reasonably imply that a customer may record phone calls in the unlisted states in all instances.  Let alone does it imply that a customer may do what Eady did—that is, violate 18 U.S.C. § 2511(1)(a).  The webpage says nothing about why a customer cannot record calls in those states.  Nor does it say anything about why a customer may record calls in the unlisted states.  Second, and as noted above, TapFury's Terms of Service contained various disclaimers and warnings suggesting that certain uses of Evil Operator were unlawful.  (D.E. No. 59-2, Ex. 5, Gov't Ex. 148A).  While the Terms of Service did not point out the wiretapping issues, the Terms of Service dispelled the notion (apparently held by Eady) that any and all use of Evil Operator would be lawful.  _See, e.g._, _Hassler v. Sovereign Bank_, 644 F. Supp. 2d 509, 515 (D.N.J. 2009) (collecting cases for proposition that, "where a CFA claim is based upon an allegedly incomplete or misleading disclosure, and where the parties' agreement contains the very information that Plaintiffs allege was misrepresented, suppressed, or concealed, dismissal for failure to state a claim is appropriate" (cleaned up)), _aff'd_, 374 F. App'x 341, 344 (3d Cir. 2010) ("Whether a practice itself is unfair is a classic jury question. However, where the claim is based on written statements, the court must make the legal

determination of whether a practice can be said to be unfair in light of the written statements.  The terms of the Account Agreement here clearly explained the actions that Sovereign eventually undertook.  Therefore, there is no jury question, but only the legal question of whether those terms and actions violate the NJCFA in light of having been explained in the Account Agreement.").  And third, the statement is not misleading because Eady, like all others, is "presumptively charged with knowledge of the law" and is therefore presumed to know how far the statement goes.  *See Cole*, 2017 WL 2805499, at *4 (citations omitted).

The second statement appears in the Internet article authored by Ruby Saleh, which was described above.  Ruby Saleh explains to readers that PrankDial.com complied with one-party consent states because "[w]e consider the person initiating the call to be the consenting party." (*Id.* at 8).  Ruby Saleh appears to offer an erroneous legal opinion—that is, that a customer can give the consent necessary to avoid violating § 2511(1)(a).  While there is no evidence suggesting she did not actually believe that to be true, a reasonable jury could find that her statement had the capacity to cause an average consumer to incorrectly believe that Eady's conduct would not violate § 2511(1)(a).

However, the Court agrees with Defendants that there is no "causal relationship between Defendants' conduct and [Eady's] loss." (Defs. Mov. Br. at 16).  His "loss was caused solely by [his own] conduct." (*Id.*).

"[A] private plaintiff must show that he or she suffered an 'ascertainable loss * * * as a result of' the unlawful conduct." *Meshinsky v. Nichols Yacht Sales, Inc.*, 541 A.2d 1063, 1067 (N.J. 1988) (first citing *Daaleman v. Elizabethtown Gas Co.*, 390 A.2d 566 (N.J. 1978); and then citing *Ramanadham v. New Jersey Mfrs. Ins. Co.*, 455 A.2d 1134 (N.J. Super. App. Div. 1982)).  Thus, a "plaintiff must establish 'the extent of any ascertainable loss, particularly proximate to a

misrepresentation or unlawful act of the defendant condemned by the [Act].'"  *Id.* (quoting *Ramanadham*, 455 A.2d at 1136).  While a plaintiff need not show reliance, the plaintiff must "demonstrate a causal connection between the unlawful practice and ascertainable loss."  *Belmont Condo. Ass'n, Inc. v. Geibel*, 74 A.3d 10, 24 (N.J. Super. App. Div. 2013).  Similarly, a plaintiff must show the misrepresentation was made "to induce the buyer to make the purchase."  *Cole v. Laughrey Funeral Home*, 869 A.2d 457, 462 (N.J. Super. App. Div. 2005).

Here, Eady cannot prove causation, or that the misleading statement was made to induce him to purchase tokens to use Evil Operator, because Ruby Saleh published the article on June 13, 2012—*months after* Eady purchased tokens to use Evil Operator, on August 25, 2011, and March 3, 2012.  (D.E. No. 59-1, Ex. A, Gov't Ex. 150A).  In addition, the record shows that Eady used Evil Operator in violation of § 2511(1)(a) before Ruby Saleh published the article:  He confessed his conduct to a friend in spring 2012 (Defs. SUMF ¶ 10); in his deposition, he admitted he used Evil Operator in May 2012 to record a conversation of one of his targets (D.E. No. 58-3, April 9, 2021 Deposition of Kirk Eady, at 35:9–36:15); and in his opposition brief, he concedes he used "the Evil Operator product on several occasions from March 1, 2012 through July 30, 2012" (Eady Opp. Br. at 7).  Although July 30 falls after June 13, the fact remains that Eady used Evil Operator in violation of federal law and admitted to doing so before Ruby Saleh published the article.  Finally, in his deposition, Eady never mentions Ruby Saleh's article when explaining why he thought PrankDial and Evil Operator were misleading.  Instead, he testified that he used Evil Operator in an illegal manner as a result of Defendants' representations concerning its popularity and their prohibition on recording calls made to people in certain listed states.  (D.E. No. 58-3, April 9, 2021 Deposition of Kirk Eady, at 26:13–21, 31:16–21 & 49:22–50:16).

17

Failing to show causation or that the statements were made to induce the transaction, Eady cannot maintain a claim under the CFA for Ruby Saleh's misleading statement. *See Cole*, 869 A.2d at 462–63 (holding that the alleged misrepresentations were not "made to induce the buyer to make the purchase" because they were "done after the contract for funeral services was entered into"); *cf. Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 531 (D.N.J. 2011) (dismissing claim for failure to plead causation—"that they, or any of their prescribing doctors, received a misrepresentation of fact from Defendants and relied on that misrepresentation"); *Ramirez v. STi Prepaid LLC*, 644 F.Supp.2d 496, 501 (D.N.J. 2009) (finding adequate allegations that plaintiffs would not have purchased the items at issue if truth was disclosed). Accordingly, summary judgment in favor of Defendants is proper.

### B.     Remaining Claims

The other nine counts in the SAC are as follows: breach of contract, violation of the covenant of good faith and fair dealing, rescission of contract that was the product of fraud, breach of express warranty, breach of implied warranty, pierce of the corporate veil, negligent misrepresentation, fictious parties, and punitive damages. (SAC ¶¶ 52–62 & 79–108). Defendants moved for summary judgment on all counts. Eady only moved for summary judgment on his claim under the CFA, and he does not defend his other counts in opposing Defendants' motion for summary judgment. Though the Court could find Eady abandoned those claims based on his failure to defend them,[6] the Court briefly explains why summary judgment is proper on each.

---

[6]      *See, e.g., Prioli v. Cty. of Ocean*, No. 18-0256, 2021 WL 4473159, at *16 (D.N.J. Sept. 30, 2021); *Lutz Surgical Partners PLLC v. Aetna, Inc.*, No. 15-02595, 2021 WL 2549343, at *18 (D.N.J. June 21, 2021); *Bernard v. Webb-McRae*, No. 17-7030, 2020 WL 1329934, at *2 (D.N.J. Mar. 23, 2020); *Callen Constr., LLC v. Matsuk*, No. 15-6056, 2018 WL 672639, at *5 (D.N.J. Feb. 2, 2018); *Skirpan v. Pinnacle Health Hosps.*, No. 07-1730, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010).

*Breach of contract*.   For a breach of contract claim, a plaintiff must prove four elements: (i) that the parties entered into a contract; (ii) that the plaintiff did as the contract required of him; (iii) that the defendant breached the contract; and (iv) that the defendant's breach caused a loss to the plaintiff.   *See Goldfarb v. Solimine*, 245 A.3d 570, 577 (2021).   Eady has not pointed to any provision of the Terms of Service that Defendants failed to follow, and the Court does not perceive any on this record.   Because Plaintiff failed to submit evidence concerning the third element, summary judgment for Defendants is proper.

*Covenant of good faith and fair dealing*.   In New Jersey, "every contract contains an implied covenant of good faith and fair dealing."   *Graddy v. Deutsche Bank*, No. 11-3038, 2013 WL 1222655, at *4 (D.N.J. Mar. 25, 2013).   To succeed on a claim for breach of the implied covenant, a plaintiff must prove (i) "a contract exists between the plaintiff and the defendant"; (ii) "the plaintiff performed under the terms of the contract unless excused"; (iii) "the defendant engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the plaintiff of the rights and benefits under the contract"; and (iv) "the defendant's conduct caused the plaintiff to suffer injury, damage, loss, or harm."   *Wong v. Wells Fargo Bank N.A.*, No. 14-5204, 2015 WL 6164036, at *4 (D.N.J. Oct. 20, 2015).   Eady has not pointed to anything Defendants did to deprive Eady of his rights and benefits to use Evil Operator.   Because he failed to submit evidence concerning the third element, summary judgment is proper.

*Rescission and Negligent Misrepresentation*. For the same reasons Eady's claim under the CFA cannot survive summary judgment, his claims of negligent misrepresentation and rescission of contract that was the product of fraud cannot survive summary judgment.   Indeed, except for the scienter element, those claims share elements. *See Columbus LTACH Mgmt., LLC v. Quantum LTACH Holdings, LLC*, No. 16-6510, 2018 WL 2455922, at *5 (D.N.J. May 31, 2018) ("The

elements of negligent misrepresentation are essentially the same as those of common law fraud except negligent misrepresentation does not require scienter." (quoting *New York Pipeline Mech. Contractors, LLC v. Sabema Plumbing & Heating Co.*, No. 10-0148, 2012 WL 209349, at *4 (D.N.J. Jan. 24, 2012)); *Jewish Ctr. of Sussex Cty. v. Whale*, 432 A.2d 521, 524 (N.J. 1981) (explaining that, except for scienter, the elements of equitable fraud are the same as common law fraud); *accord Nissan Motor Acceptance Corp. v. Infiniti of Englewood, LLC*, No. 18-17228, 2020 WL 7061085, at *6 (D.N.J. July 14, 2020). In addition, "[r]escission is an equitable remedy that is only exercised when there is no adequate remedy at law." *Osio*, 2006 WL 2129460, at *18. So even if Eady had a claim for fraud, he would not have a claim for rescission because the CFA would entitle him to damages.

    <u>*Breach of express and implied warranty.*</u> To make a case for breach of an express warranty, the plaintiff must, at minimum, show an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Ford Motor Credit Co., LLC v. Mendola*, 48 A.3d 366, 375 (N.J. Super. App. Div. 2012) (quoting N.J.S.A. § 12A:2-313(1)(a)). For a claim of breach of an implied warranty, New Jersey law provides, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." *Kuzian v. Electrolux Home Prod., Inc.*, 937 F. Supp. 2d 599, 612 (D.N.J. 2013) (quoting N.J.S.A. § 12A:2-314). Moreover, "[i]n order to establish a breach of either warranty, plaintiffs 'must show that the equipment they purchased from defendant was defective.'" *Id.* (quoting *Crozier v. Johnson & Johnson Consumer Companies, Inc.*, 901 F. Supp. 2d 494, 509 (D.N.J. 2012)). "However,

'establishing a breach of the implied warranties of merchantability and fitness for a particular purpose requires a showing regarding the product's functionality, not the advertisements that allegedly induced a customer to purchase it.'" *Id.* at 612–13 (quoting *Crozier*, 901 F.Supp.2d at 509).

Eady has not shown, and the Court does not perceive on this record, that Defendants made an affirmation of fact or promise relating to Evil Operator that formed the basis of the parties' bargain. Nor is there any basis in the record to find there was an implied warranty that the goods were fit for a particular purpose. Nor is there any indication that PrankDial or Evil Operator were defective. Finally, the Terms of Service for PrankDial disclaim the following: "The Company makes no warranties, express or implied, with regard to PrankDial, including but not limited to warranties of merchantability or fitness for a particular purpose." (D.E. No. 59-2, Ex. 5, Gov't Ex. 148B). Accordingly, summary judgment is proper on Eady's warranty claims.

*Pierce of the corporate veil, fictious parties, and punitive damages.* Eady's counts titled "pierce the corporate veil," "fictious parties," and "punitive damages" are unavailing because he does not survive summary judgment on any of his independent claims. Moreover, as Defendants point out, he did not identify any fictious parties subject to his claims. (Defs. Mov. Br. at 19).[7]

**IV.   CONCLUSION**

For the reasons set forth above, the Court DENIES Plaintiff's motion, GRANTS Defendants' motion, and enters judgment in Defendants' favor.

Date: April 1, 2022

_____
Hon. Esther Salas, U.S.D.J.

---

[7]     In light of the Court's holding, it is unnecessary to address Defendants' argument that Eady is collaterally estopped from bringing a claim as a result of certain rulings and the judgment in his criminal case. (Defs. Mov. Br. at 24–27).